JOSE TORRES[1] *vs.* ATTORNEY GENERAL & others.[2]

Suffolk. September 13, 1983. — January 30, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Privacy. Attorney General. Department of Social Services. Fair Information Practices Act,* Availability of remedy, Damages, Counsel fees. *Damages,* Privacy case, Counsel fees. *Legal Services Organization. Waiver. Words,* "Personal data," "Public records," "Unwarranted," "Incurred."

Information contained in an affidavit of an employee of the Department of Social Services, which had been derived from the case file of a client served by the department, but without his consent, and which concerned his whereabouts on particular dates, was "personal data" as defined in the Fair Information Practices Act, G. L. c. 66A, and was not subject to disclosure in the absence of any evidentiary showing that the invasion of privacy was warranted. [5-11]

A client of the Department of Social Services did not, by bringing a Federal court action against various State officials, waive any of his rights under G. L. c. 66A, the Fair Information Practices Act, to the confidentiality of certain personal data in his departmental case file. [11]

---

[1] This action was brought on Jose Torres's behalf by Miguel Torres, his father and next friend.

[2] The other defendants are Maureen Fox, as she is an assistant attorney general of the Commonwealth; Mary Jane England, as she was Commissioner of the Department of Social Services of the Commonwealth; and Nancy Prostack, as she is a caseworker in the Department of Social Services of the Commonwealth.

The assistant attorney general defending a Federal court action brought by a client of the Department of Social Services against various State officials was not an "investigative agent of the Attorney General," within the meaning of regulations adopted under G. L. c. 66A, § 3, to whom the department could lawfully disclose personal data contained in the client's case file. [11-13]

Where the Department of Social Services was found to have violated the Fair Information Practices Act, G. L. c. 66A, with respect to its disclosure of certain personal data, the data subject was entitled by G. L. c. 214, § 3B, to exemplary damages of at least $100, even if he had sustained no actual damages and even if the department had acted in good faith. [13-14]

A plaintiff represented by a legal services organization was entitled under G. L. c. 214, § 3B, to an allowance for attorney's fees "incurred" in an action against a State agency which, as the holder of "personal data," had disclosed information about him in violation of the Fair Information Practices Act, G. L. c. 66A. [14-16] LYNCH, J., dissenting.

Absent a reasonable basis in the record for allowance of an attorney's fee of only $1,500 in an action by a client of the Department of Social Services, against certain State officials for wrongful disclosure of personal data in violation of the Fair Information Practices Act, G. L. c. 66A, this court remanded the case for a redetermination of the proper amount to be awarded as attorney's fees. [16]

CIVIL ACTION commenced in the Superior Court Department on July 10, 1981.

The case was heard by *Pierce, J.,* on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Linda M. Irvin,* Assistant Attorney General (*John P. Graceffa,* Assistant Attorney General, with her) for the defendants.

*Nadine Cohen* (*Paula Mackin* with her) for the plaintiff.

*Ernest Winsor,* for Coalition for Basic Human Needs, amicus curiae, submitted a brief.

WILKINS, J. In the course of the defense of an action brought by the plaintiff, Jose Torres, in the United States District Court for the District of Massachusetts against certain State officials, the defendant Assistant Attorney General Fox requested and received in the form of an affidavit from

the defendant Prostack, an employee of the Department of Social Services (DSS), certain information in the DSS files concerning Torres. The parties have agreed, "[o]n information and belief," that the affidavit contained "information including, but not limited to, a chronology of . . . Torres' geographic location."[3]

Information concerning Torres's whereabouts at various times (and whatever other information may have been in the affidavit) may have significance in the determination of his rights in the Federal action. Torres argues that the disclosure of the information concerning him in the DSS affidavit violated the Fair Information Practices Act (FIPA) (G. L. c. 66A, inserted by St. 1975, c. 776, § 1). We agree with the decision of the Superior Court judge that the disclosure was made in violation of the FIPA.

The case appears to have been presented solely on a stipulation to relevant facts which the judge largely adopted. In August, 1979, Torres and others commenced the Federal court action against the Commissioner of the Massachusetts Department of Mental Health, the Commissioner of the Massachusetts Department of Education, the Secretary of Human Services, and the Governor. Civil Action No. 79-1652-K (D. Mass., August 16, 1979). The Federal court action seeks the delivery of "appropriate education and mental health services" which, it is alleged, Torres and other emotionally disturbed children and adolescents have been unlawfully denied. The office of the Attorney General through the defendant Fox represents the defendants in the Federal court action.

Torres, who apparently has attained the age of eighteen while this State proceeding has been pending, had been a client of the DSS. The defendant Prostack, the DSS social worker assigned to Torres's case, had assembled a case file containing confidential and personal information about Torres. A case file typically contains such information as a

---

[3] Because the assistant attorney general representing the defendants in this action and counsel for Torres have not seen the affidavit, the parties were not able to agree precisely on its contents.

client's name and address, his residential history, family situation and background, educational history, evaluations by social workers, psychologists, and psychiatrists, and records of any court involvement. It is from Torres's case file that the information contained in the DSS affidavit was obtained. In seeking the information contained in the affidavit, the office of the Attorney General was acting solely for the purpose of defending the Federal court action.

In February, 1981, Torres's counsel learned of the affidavit and objected to the disclosures made in it. It is agreed that neither Torres nor his parents consented to the release of information concerning him in the DSS files. Neither the affidavit nor its substance has been used in the Federal court litigation. Although the defendants Fox and the Attorney General declined to agree not to use the information in the DSS affidavit in the Federal court action, they did agree to give advance notice to Torres's counsel if the defendant Fox should decide to submit the affidavit in court. Attempts to resolve the dispute concerning the DSS affidavit were unsuccessful, and this action followed.

Torres sought equitable and declaratory relief and damages for the alleged release of personal data in violation of the FIPA. The trial judge concluded that the information in the DSS affidavit was "personal data," as defined in the FIPA (G. L. c. 66A, § 1). He further concluded that the disclosure of the information in the DSS affidavit was a violation of the FIPA because that disclosure was not approved by Torres or otherwise authorized by statute or regulation. He entered a judgment enjoining the defendant Fox and the Attorney General from disseminating or using the information taken from Torres's DSS file, in the absence of an appropriate court order. He also enjoined the defendant Prostack and the Commissioner of DSS from disseminating personal and confidential DSS information concerning Torres to the Attorney General in the absence of an appropriate court order. He further ordered the defendant Fox and the Attorney General to destroy all copies of personal

and confidential information taken from Torres's DSS file.[4] By a subsequent order the judge directed the defendants to pay exemplary damages of $100, attorney's fees of $1,500, and court costs of $40. The trial judge stayed execution of his order pending appeal.

The defendants have appealed, challenging the judge's determination that there had been a violation of the FIPA and further challenging his award of exemplary damages and attorney's fees. Torres has also appealed, arguing that the amount awarded for attorney's fees is unreasonably low. We granted the defendants' application for direct appellate review. We agree with the trial judge's determination that there was a violation of the FIPA. We also agree that Torres is entitled to an award of attorney's fees (and costs), but the obligation to pay that award should be placed solely on the DSS. We agree with Torres that an award of attorney's fees of $1,500 was not adequate on the record, and we remand the case for a redetermination of the amount to be awarded for attorney's fees.

1. We consider first whether the information set forth in the DSS affidavit concerning Torres was of a character generally protected from disclosure under the FIPA. One major objective of the FIPA was to limit access to personal data maintained by a State agency (the holding agency or "holder," as defined in G. L. c. 66A, § 1). Generally, no other agency and no individual not employed by the holding agency is allowed access to personal data "unless such access is authorized by statute or regulations which are consistent with the purpose of [G. L. c. 66A] or is approved by the data subject whose personal data are sought." G. L. c. 66A, § 2 (c), as appearing in St. 1977, c. 691, § 8. Penalties are provided for violations of any provision of the FIPA. G. L. c. 214, § 3B.

Our concern is whether the information disclosed by the DSS affidavit concerning Torres is "personal data." The

---

[4] The defendant Fox subsequently filed an affidavit stating that she had destroyed the affidavit of the defendant Prostack and had made no copies of it.

question arises under the definition of "personal data" as amended in 1977. G. L. c. 66A, § 1, as appearing in St. 1977, c. 691, § 6.[5] The 1977 amendment added language which, for our purposes, states that information contained in a public record, as defined in G. L. c. 4, § 7, Twenty-sixth, is not personal data.[6]

Our attention is thus turned to the definition of "public records" in G. L. c. 4, § 7, Twenty-sixth, as amended through St. 1977, c. 691, § 1. The portions of the definition that are relevant to the arguments in this case are set forth in the margin.[7] No longer can clause Twenty-sixth (a) apply

[5] The 1977 amendment defines "personal data" as "any information concerning an individual which, because of name, identifying number, mark or description can be readily associated with a particular individual; provided, however, that such information is not contained in a public record, as defined in clause Twenty-sixth of section seven of chapter four and shall not include intelligence information, evaluative information or criminal offender record information as defined in section one hundred and sixty-seven of chapter six."

As originally defined by the 1975 act, "personal data" are "any information concerning an individual which, because of name, identifying number, mark or description can be readily associated with a particular individual." G. L. c. 66A, § 1, inserted by St. 1975, c. 776, § 1. Because of the restriction on interagency transfer of personal data, there is little question that, under the original provisions of G. L. c. 66A, access to the identifiable information in the DSS files concerning Torres could not have been lawfully given to the Attorney General. That information would not have been available under the public records law as a "public record" because it was material or data "specifically . . . exempted from disclosure by statute." G. L. c. 4, § 7, Twenty-sixth (a), as appearing in St. 1973, c. 1059, § 1, defining "public records."

[6] The emergency preamble of the 1977 act amending G. L. c. 66A (St. 1977, c. 691) states that its purpose was "to prevent potential conflicts between the demands of individual rights of privacy and the need to make certain information available to the public." See also Special Legislative Commission on Privacy — Second Interim Report, 1977 House Doc. No. 6106, at 9, quoted in *Swartz* v. *Department of Banking & Ins.*, 376 Mass. 593, 598 (1978). Ironically, the 1977 amendments created the conflict which we must resolve in this case.

[7] " 'Public records' shall mean all books, papers, maps, photographs, recorded tapes, financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the

because, due to the 1977 amendment of G. L. c. 66A, § 1, there is no specific statutory exemption from disclosure, apart from any exemption supplied by some other subclause of the definition of "public records."[8] Nor do we see any exemption by necessary implication. The legislative directive that we consider the definition of "public records" in determining what personal data are leaves no room for such an implication.[9]

The language on which the parties' disagreement must be resolved is the concluding portion of clause Twenty-sixth (c), which excludes from "public records" those "materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy." The word "unwarranted" was added to subclause (c) of G. L. c. 4, § 7, Twenty-sixth, by the same 1977 act that amended the definition of "personal data." St. 1977, c. 691, § 1. These two 1977 amendments in essence broadened the range of information that might be available as public records and reduced the scope of data that are "personal data."

---

commonwealth, or of any political subdivision thereof, or of any authority established by the general court to serve a public purpose, unless such materials or data fall within the following exemptions in that they are:

"(a) specifically or by necessary implication exempted from disclosure by statute;

". . . .

"(c) personnel and medical files or information; also any other materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy."

[8] We assume here that the information disclosed was not protected from disclosure under the prohibition of disclosure of certain information acquired by a licensed social worker. G. L. c. 112, § 135. Of course, any such protected information is expressly excluded from "public records" by the language of G. L. c. 4, § 7, Twenty-sixth (a).

[9] "[I]f a record is made public by the public records law, the personal data in it would not be covered by FIPA." Special Legislative Commission on Privacy — Second Interim Report, 1977 House Doc. No. 6106, at 12, discussing the proposed amendment to the definition of "Personal data" in G. L. c. 66A, § 1, that was adopted verbatim, in respects relevant to this case, in St. 1977, c. 691, § 6.

In any attempt to determine whether disclosure of the information about Torres contained in the DSS affidavit may constitute an unwarranted invasion of privacy, or, as the statute redundantly says, "personal privacy," it would be helpful to know just what the information was, who provided it in what circumstances, and whether it was otherwise available. We are advised with certainty only that the information concerned Torres's whereabouts at certain times. Disclosure of information provided to DSS in connection with obtaining government services or benefits would normally be regarded as an invasion of privacy.[10] Torres is a member of a class of persons for whom the protections of the FIPA were particularly intended.[11] No member of the pub-

---

[10] An expectation of privacy in such a situation is particularly justified. For example, the Social Services Policy Manual of the Department of Public Welfare provides that individuals applying for social services have a right to expect "that all information concerning themselves and their problems will be handled with the strictest confidentiality." 106 Code Mass. Regs. 200.002 (1979).

[11] The point was clearly made in the Special Legislative Commission on Privacy — First Interim Report, 1975 House Doc. No. 5417, at 15-16, in the following language:

"Increasingly, it appears that in exchange for certain benefits received from government (and business), individuals are assumed to waive any and all interest and control over the information collected about or surrendered by them.

"This is especially true for the relatively powerless persons who tend to be in greatest need of government services.

"Ironically, the right of informational privacy is most in jeopardy with those groups in the population least likely to fight to preserve it. To a young mother on welfare whose primary concern is feeding her child, to the unemployed head of a household trying to secure work, to the drug dependent who turns to a drug treatment center for help, to the indigent patient in a hospital in need of emergency medical attention, persons who need the necessities of life are quite willing to trade off great quantities of personal information, without regard for the potential uses or abuses of that personal data.

"The implicit assumption on the part of each person in the examples listed is that information will be used to assist them in the delivery of services — not aware that the information obtained may be disseminated or made available to other agencies without the consent of the data subject for purposes quite different from those for which the information was originally released."

lic could have come in off the street and rightfully obtained any information from DSS concerning a private individual.

Certainly the expectations of the data subject are relevant in determining whether disclosure of information might be an invasion of privacy. Compare *Hastings & Sons Publishing Co.* v. *City Treasurer of Lynn*, 374 Mass. 812, 817-818 (1978) (disclosure of policemen's payroll records not shown to constitute an invasion of privacy), with *Attorney Gen.* v. *School Comm. of Northampton*, 375 Mass. 127, 132 (1978) (disclosure of names of applicants for position of superintendent of schools might constitute an invasion of privacy as to some applicants). Thus the same information about a person, such as his name and address, might be protected from disclosure as an unwarranted invasion of privacy in one context and not in another.[12]

The word "unwarranted," added by the 1977 amendment, particularly suggests a weighing of the circumstances of the data subject — a balancing of the public's right to know as reflected in the Commonwealth's public records law, and the individual's right to protection against an unwarranted intrusion into his privacy. The exemption of subclause (c) appears to be the only exemption in the definition of "public records" calling for a balancing of interests rather than for an objective determination of fact.[13] In the

---

[12] The Attorney General has noted that this distinction must be drawn, based on whether a person has or has not a legitimate privacy interest in the disclosure of his name and address in the files of State agencies. Compare Report of the Attorney General to the Chairman of the Division of Industrial Accidents, Rep. A.G., Pub. Doc. No. 12, at 90-91 (1978) (disclosure of names and addresses of employees who have sought workmen's compensation benefits would be an invasion of privacy) with Report of the Attorney General to the Secretary of the Executive Office of Consumer Affairs, Rep. A.G., Pub. Doc. No. 12, at 161 (1977) (names and addresses of persons licensed by State agencies to engage in certain trades or professions not protected from disclosure).

[13] Similar, but not identical, language in the Federal Freedom of Information Act concerning the exemption from disclosure of "files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" (5 U.S.C. § 552[b][6] [1970]) is also unique in that act in calling for a "discretionary balancing of competing interests." See *Getman* v. *NLRB*, 450 F.2d 670, 674 n.10 (D.C. Cir. 1971).

balancing of interests, did the Legislature contemplate that the interests of the person who seeks the record must also be weighed? In other words, may an invasion of privacy be warranted when the request for special data is supported by strong public policy considerations and not warranted when the request for the same data is not so supported? We question whether the Legislature intended a variable definition of "personal data" and "public records," depending on the merits of the information seeker's need. It may be that the public records law was intended only to make properly maintained information available to members of the public treated collectively and not intended to differentiate among the purposes for which information is requested. That seems to be the view taken of the Federal Freedom of Information Act. See *Kurzon* v. *Department of Health & Human Servs.,* 649 F.2d 65, 68 n.2 (1st Cir. 1981); *DePlanche* v. *Califano,* 549 F. Supp. 685, 693 (W.D. Mich. 1982).

We need not decide, however, whether the reason why personal data are sought can ever warrant an invasion of privacy because, even if an applicant's reasons are to be considered, the defendants here have not presented an adequate reason why the disclosure of Torres's whereabouts on particular dates (the invasion of "personal privacy") was so essential to its defense of the Federal case that disclosure was warranted at the time it was made. The burden is on the defendants to show that the invasion of Torres's privacy was warranted. In an action to obtain information under the public records law, the burden is placed on a holding agency seeking to withhold that information to prove that one of the exemptions in the definition of public records applies. G. L. c. 66, § 10 (*c*). Under the FIPA, however, the situation is different because the holding agency may (as here) wish to disclose information. When a data subject shows that information falls within the definition of personal data, but for the exemption for public records, and further shows that the disclosure not only might be, but in fact is, an invasion of privacy, the State agency seeking to justify the disclosure has the burden of showing that an invasion of privacy is

warranted. Here, there has been no evidentiary showing that the invasion of privacy was warranted. The information disclosed was, therefore, "personal data" not subject to disclosure unless some other provision of the FIPA permitted its disclosure.

2. The defendants argue that, by bringing the Federal action, Torres waived his right to have any personal data contained in the DSS affidavit held in confidence. The FIPA does not recognize the concept of waiver as such. Under G. L. c. 66A, § 2 (c), access to personal data may be "approved by the data subject whose personal data are sought." We see no approval of access to any personal data held by DSS inherent in Torres's commencement of an action against other State agencies or in any communication of his counsel seeking relief. The word "approval," as used in § 2 (c), requires conscious attention to the question of the disclosure of the personal data and assent by the data subject himself (or someone authorized to act on his behalf). If there may be room for an implied approval of the disclosure of personal data in particular circumstances, the facts in this case present no basis for such an implication. Nor do we see the commencement of the Federal action as constituting a waiver of Torres's right of privacy under G. L. c. 66A or as making the invasion of privacy warranted.

If the limitations of G. L. c. 66A unreasonably restrict the defense of actions against State employees or State agencies, the remedy must be legislative. Restraints on governmental action often serve a wide public objective, even at a sacrifice in particular circumstances, and are not uncommon in the law of this Commonwealth.

3. The defendants argue that the disclosure of information to the office of the Attorney General by DSS was permitted by G. L. c. 66A, § 2 (c), because it was "authorized by statute or regulations which are consistent with the purposes of this chapter." The Executive Office of Human Services (EOHS), of which DSS is a part (G. L. c. 6A, § 16), had adopted a regulation pursuant to G. L. c. 66A, § 3, stating that "[a]ny agency which is a holder of personal data may

give access to that data to authorized *investigative agents* of the Attorney General . . . acting in furtherance of their official duties" (emphasis added). 101 Code Mass. Regs. 8.06 (7) (1979). Further, the defendants assert a statutory authorization for access to Torres's personal data because the Attorney General has certain rights and obligations under G. L. c. 12, § 3, including the defense of civil actions against State officials and agencies.

We have acknowledged the special responsibility that the Attorney General has in handling the Commonwealth's legal business. See *Clerk of the Superior Court for the County of Middlesex* v. *Treasurer & Receiver Gen.,* 386 Mass. 517, 526 (1982); *Feeney* v. *Commonwealth,* 373 Mass. 359, 365 (1977); *Secretary of Admin. & Fin.* v. *Attorney Gen.,* 367 Mass. 154, 158-165 (1975). That special responsibility, some of which has a common law rather than a statutory origin (*Opinion of the Justices,* 354 Mass. 804, 809 [1968]), does not include by implication statutory authorization for access to Torres's personal data in the circumstances of this case. Although the Attorney General's obligations transcend the interests of a State employee or a State agency being sued, we see no legislative intent to grant the office of the Attorney General open access to personal data held by one State agency simply because a data subject has brought a suit against one or more other State agencies.

The EOHS regulation must be construed so as to avoid creating the possibility of exceptions as broad as the protection granted by the FIPA. If the EOHS regulation were read to permit access by any assistant attorney general whenever it is thought that personal data of a litigant might be helpful in the prosecution or defense of litigation, the regulation would not be consistent with the purposes of the FIPA. The limiting words, "investigative agents of the Attorney General," in the EOHS regulation must not be ignored. We view the exception granted by the EOHS as extending no further than to the disclosure of personal data in connection with investigations and as not including disclosure of personal data to agents of the Attorney General "investigat-

ing" the defense of a civil action. The Attorney General may well conclude that the allegations of a legal action require not only the defense of an action but also investigation of the question whether an agency is complying with the requirements of law. In such a case, if personal data are concerned, the investigative and the defense roles of the office of the Attorney General should be separated. On this record, the assistant attorney general who received the DSS affidavit was not an investigative agent of the Attorney General.

4. A holder of personal data which violates any provision of G. L. c. 66A "shall be liable for exemplary damages of not less than one hundred dollars for each violation," even if the data subject sustained no actual damages. G. L. c. 214, § 3B, as amended through St. 1977, c. 691, § 14. Such a holder is also liable for "such costs and reasonable attorney's fees as may be *incurred* in said action" (emphasis added). *Id.* The motion judge ordered the defendants to pay Torres $100 as exemplary damages and to pay him $1,500 as attorney's fees and $40 in court costs. The defendants challenge the award of exemplary damages and attorney's fees. By his cross appeal, Torres challenges the amount of attorney's fees awarded.

By its terms, G. L. c. 214, § 3B, mandates the payment of at least $100 in exemplary damages when a holder has been shown to have violated a provision of G. L. c. 66A. There is, of course, no evidence in this case that any defendant acted maliciously, fraudulently, or wantonly toward Torres. Nor is there any evidence that Torres sustained any damage because of the violation of G. L. c. 66A. In the absence of a statutory directive, an award of exemplary damages would not be appropriate in this case. See *International Fidelity Ins. Co.* v. *Wilson,* 387 Mass. 841, 856 n.20 (1983). However, the statute provides no exception for good faith conduct, nor does it grant discretion to the judge whether to award exemplary damages of $100.

The statute is directed against State agencies that are "holders," as defined in G. L. c. 66A, § 1. We decline to read the words "shall be liable" as permitting any element

of judicial discretion. An award of exemplary damages of at least $100 was required, once the FIPA violation was found. However, G. L. c. 214, § 3B, places the obligation to pay exemplary damages (and attorney's fees and costs) on the holder who violated G. L. c. 66A and not on any individual State employee. The agency is the "holder," not its employees. The Commissioner of DSS is a named defendant in her official capacity. The order for exemplary damages (and attorney's fees and costs) should have been directed against the DSS alone. We shall remand the case for an appropriate revision of that order.

The defendants argue that Torres is not entitled to an allowance for attorney's fees because G. L. c. 214, § 3B, only calls for an award of attorney's fees "incurred in said action," and it is agreed that Torres has no obligation to pay an attorney's fee because a legal services organization has represented him. We have said that, if a statute authorizes an award of attorney's fees, an award may be made to a legal services organization. See *Darmetko* v. *Boston Hous. Auth.*, 378 Mass. 758, 764 (1979); *Lincoln St. Realty Co.* v. *Green*, 374 Mass. 630, 632 (1978). The question whether a person such as Torres has "incurred" attorney's fees within the meaning of a statute similar to the FIPA has generally been answered elsewhere in the affirmative.[14] We now join

---

[14] We noted the issue, but did not have to decide it, in *Lincoln St. Realty Co.* v. *Green*, 374 Mass. 630, 632 n.2 (1978), where we referred to a statute (G. L. c. 186, § 20) concerned with the award of attorney's fees "incurred" by a tenant in an action involving her landlord.

The Federal Equal Access to Justice Act directs that generally a prevailing private party shall be awarded fees incurred in certain civil actions brought by or against the United States. 28 U.S.C. § 2412(d)(1)(A) (1976 & Supp. 1980). Almost universally Federal courts have allowed legal fees when the successful prevailing private party was represented by a legal services organization. See *Ceglia* v. *Schweiker*, 566 F. Supp. 118, 122-123 (E.D.N.Y. 1983); *Jones* v. *Schweiker*, 565 F. Supp. 52, 54-55 (W.D. Mich. 1983); *Ward* v. *Schweiker*, 562 F. Supp. 1173, 1175 (W.D. Mo. 1983); *Kauffman* v. *Schweiker*, 559 F. Supp. 372, 373-375 (M.D. Pa. 1983); *Kinne* v. *Schweiker*, No. 80-81 (D. Vt. December 29, 1982); *Hornal* v. *Schweiker*, 551 F. Supp. 612, 616-617 (M.D. Tenn. 1982). *Contra Cornella* v. *Schweiker*, 553 F. Supp. 240 (D.S.D. 1982). Cf. *Cazalas* v. *United States Dep't of Justice*, 709 F.2d 1051, 1057 (5th Cir. 1983) (attor-

that view. The reasoning is that the Legislature allows attorney's fees to a successful litigant in such cases to encourage private enforcement of the law and to encourage the government to comply with the law at the risk of a financial loss to it if it does not. These legislative goals have been given more weight in construing the word "incurred" in the context of such statutes than has the meaning of the word in a debtor-creditor sense. Torres was entitled to an award of attorney's fees.

Torres argues that the allowance of attorney's fees in the amount of $1,500 was unreasonably low and that the motion judge did not properly apply the standards for determining a reasonable fee that are set forth in our opinion in *Stratos* v. *Department of Pub. Welfare*, 387 Mass. 312, 319 (1982). Torres also argues that the judge gave no reason for rejecting his request for substantially higher fees.

The claim for attorney's fees was presented on affidavits of the three counsel who worked on behalf of Torres. Two attorneys worked on the matter from June, 1981, into the fall of 1981. One spent approximately 121 hours, and the other approximately 80 hours on the case. Present counsel devoted approximately 60 hours to the case. The first two attorneys represented that "at the market rate" the appropriate charge for an attorney with their experience was $80 an hour. Current counsel's affidavit indicated a market rate for an attorney of her experience was $60. The total claim represented by the affidavits was slightly less than $19,750. The defendants have not argued to us that, if an award of attorney's fees is lawful, the award of $1,500 was reasonable.

We have no question that, on the basis of the information submitted with the affidavits and the motion judge's obser-

---

ney's fees may be incurred under the Federal Privacy Act, 5 U.S.C. § 552a (g)(3)(B) (1982), by an attorney litigant acting pro se); *National Treasury Employees Union* v. *United States Dep't of the Treasury*, 656 F.2d 848, 853-854 (D.C. Cir. 1981) (under the Federal Privacy Act, fees award could be made to a legal service organization as attorney's fees "incurred"); *Crooker* v. *United States Dep't of Justice*, 632 F.2d 916, 921 n.7 (1st Cir. 1980) (a fee may be incurred where a legal service organization represents the litigant).

vations and experience (see *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 629-630 [1978]), there was an adequate basis for rejecting the total fee claimed.[15] The appropriate initial standard is the "fair market rates for time reasonably spent." *Stratos* v. *Department of Pub. Welfare, supra* at 322. "Calculation of reasonable hourly rates should begin with the average rates in the attorney's community for similar work by attorneys of the same years' experience." *Id.* at 323. There are then various appropriate considerations that may call for adjustments in the fee otherwise indicated. See *id.* at 323-324; *Draper* v. *Town Clerk of Greenfield*, 384 Mass. 444, 456-457 (1981), cert. denied, 456 U.S. 947 (1982).

On the record before us we are unable to find a reasonable basis for the allowance of a fee of only $1,500. We are unaided by any factual determinations or reasoning in support of the judge's conclusion. There must be a redetermination of the amount to be allowed for attorney's fees. Such a determination should reflect the reasonable services of counsel since the date of the services shown on the affidavits of counsel, including the efforts of Torres's counsel on the defendants' appeal and, if appropriate under the principles stated in *Stratos* v. *Department of Pub. Welfare, supra* at 325, the efforts of Torres's counsel in his appeal. To assist in that determination, we note that the presentation of Torres's position before this court was competent and appropriately directed to the issues.

5. The case is remanded to the Superior Court for appropriate revision of the order for exemplary damages, attorney's fees, and costs. In all other respects the judgment is affirmed.

*So ordered.*

---

[15] There may not have been any clear basis for the different hourly rates ($80 and $60) proposed. The change of counsel obviously involved some duplication of effort, and the joint participation of the two initial counsel may have been unnecessary on certain aspects of the case. See *Furtado* v. *Bishop*, 635 F.2d 915, 922 (1st Cir. 1980). The number of hours initial counsel devoted to this case appears to be high on the record before us.

LYNCH, J. (dissenting). As noted by the majority, this court has held that an award of counsel's fees to a party represented by a publicly-funded legal service organization was not warranted under a contract that provided for the awarding of attorneys' fees incurred by the prevailing party. *Lincoln St. Realty Co.* v. *Green,* 374 Mass. 630, 632 (1978). There, the issue whether a person so represented incurred attorneys' fees within the meaning of a statute similar to the one applicable here was noted, but not decided. *Supra* at 14. *Lincoln St. Realty Co.* v. *Green, supra* at 632 & n.2. The majority rely primarily upon decisions of the Federal courts in deciding this issue in favor of the plaintiff. The principal statute construed in these decisions, 28 U.S.C. § 2412 (d)(1)(A) (1976 & Supp. 1980), does contain what I regard as the crucial modifier, "incurred." This court, however, has interpreted the word "incur" in a different context to mean " 'to become liable to or subject to; to bring down upon oneself; as, to incur debt, danger, displeasure, penalty, etc.,' and 'to become through one's own action liable or subject to; to bring upon oneself.' " *Commonwealth* v. *Benoit,* 346 Mass. 294, 298 (1963). We have often stated that "every word of a legislative enactment is to be given force and effect." *Commissioner of Pub. Works* v. *Cities Serv. Oil Co.,* 308 Mass. 349, 360 (1941). And the words so used are to be construed according to their natural and ordinary meaning. *Chatham Corp.* v. *State Tax Comm'n,* 362 Mass. 216, 219 (1972). *Davey Bros.* v. *Stop & Shop, Inc.,* 351 Mass. 59, 63 (1966). When faced with such recognition by this court of the accepted meaning of this term, and these often applied principles of statutory construction, I find it impossible to conclude that the Legislature intended that we read the word "incurred" out of the statute for policy reasons, no matter how compelling. There is no question that the plaintiff here has not incurred legal fees in accordance with the commonly accepted usage of that term which this court has acknowledged. The majority fail to give meaning to the express words of the statute. I would, therefore, conclude that no award of fees should have been made in the plaintiff's favor.