Amato *v.* District Attorney for the Cape and Islands District.

Keith Amato[1] *vs.* District Attorney for the Cape and Islands District & others.[2]

No. 10-P-354.

Suffolk. March 16, 2011. - August 25, 2011.

Present: Mills, Brown, & Wolohojian, JJ.

*District Attorney. Deoxyribonucleic Acid. Fair Information Practices Act,* Availability of remedy, Data subject. *Privacy. Contract,* Performance and breach.

In a civil action arising from the retention by a district attorney and the State crime laboratory of records related to a sample of deoxyribonucleic acid (DNA) without consent of the plaintiff, from whom the sample was taken voluntarily as part of a murder investigation, the judge erred in dismissing that portion of the complaint alleging violation of the Fair Information Practices Act (act), where the allegations of the complaint, taken as true, plausibly suggested that *the defendants had maintained more personal data than reasonably necessary to carry out their statutory functions;* where the act permits an individual to seek the remedy of return or destruction of allegedly unreasonably-maintained records; where a retention schedule promulgated by the records conservation board did not constitute a per se reasonable *time to maintain such records;* and where the underlying criminal matter for which the DNA sample originally was sought was no longer pending on direct review. [235-239]

In a civil action arising from the retention by a district attorney and the State crime laboratory of records related to a sample of deoxyribonucleic acid (DNA) without consent of the plaintiff, from whom the sample was taken voluntarily as part of a murder investigation, the judge erred in dismissing that portion of the complaint alleging invasion of privacy, where the allegations that the defendants had retained *the plaintiff's highly* sensitive DNA records without his consent and made them available for nonconsensual use in other criminal investigations were sufficient to constitute an unreasonable, substantial, and serious interference with the plaintiff's privacy. [239-241]

In a civil action arising from the retention by a district attorney and the State crime laboratory of records related to a sample of deoxyribonucleic acid without consent of the plaintiff, from whom the sample was taken voluntarily

[1]On behalf of himself and all others similarly situated.

[2]Forensic and Technology Center of the Commonwealth of Massachusetts, Department of State Police; Executive Office Public Safety and Security; and Undersecretary of the Executive Office of Public Safety and Security.

as part of a murder investigation, and in contravention of promises made at the time of collection of limited use and retention, the judge erred in dismissing that portion of the complaint alleging breach of contract, where the State police detective who made the promises had the authority to bind the defendants. [241-242]

CIVIL ACTION commenced in the Superior Court Department on June 19, 2008.

A motion to dismiss was heard by *Nancy S. Holtz*, J.

*Mark W. Batten* (*John Reinstein* with him) for the plaintiff.

*Jessica V. Barnett*, Assistant Attorney General, for the defendants.

MILLS, J. This matter arises out of the investigation of the January, 2002, murder of Christa Worthington. The plaintiff, Keith Amato, is a private citizen who (like many others) voluntarily provided a deoxyribonucleic acid (DNA) sample at the request of investigators. Amato did so based on promises that the sample and its related data would not be retained or used if his DNA did not match the biological evidence from the crime scene. Claiming that the defendants have not stood by those promises, Amato filed a class action complaint alleging violation of the Fair Information Practices Act (FIPA), invasion of privacy, and breach of contract. On motion of the defendants, a judge dismissed the complaint pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974). We conclude that Amato's allegations that the defendants continue to hold records related to his DNA sample without his consent, and in breach of promises of limited use and retention, state a claim for equitable relief[3] under all three causes of action. Accordingly, we reverse the dismissal of Amato's claims against the District Attorney for the Cape and Islands district (district attorney) and the Forensic

---

[3]Although Amato's complaint also seeks damages, he now concedes, as he must, that the judge properly determined that G. L. c. 258, § 10(c), prevents him from seeking damages for his FIPA and invasion of privacy claims. See *Spring* v. *Geriatric Authy. of Holyoke*, 394 Mass. 274, 284-285 (1985) (invasion of privacy); *Tivnan* v. *Registrar of Motor Vehicles*, 50 Mass. App. Ct. 96, 98-102 (2000) (FIPA). Although Amato could seek damages on his breach of contract claim, see *Wong* v. *University of Mass.*, 438 Mass. 29, 31 n.6 (2002), he does not press the matter on appeal and conceded at oral argument that he no longer seeks damages. We therefore treat Amato's claim for contract damages as abandoned and address only Amato's claims for equitable relief.

and Technology Center of the Commonwealth of Massachusetts, Department of State Police (crime lab), and we remand for further proceedings.[4]

1. *Background.* We accept as true, as we must, all facts alleged in the complaint, drawing all reasonable inferences in favor of Amato. In addition, we take judicial notice of certain facts appearing in *Commonwealth* v. *McCowen*, 458 Mass. 461 (2010).[5] On January 6, 2002, Christa Worthington was found dead in her Truro home. Pursuant to G. L. c. 38, § 3(1) and (17), and G. L. c. 38, § 4, second par., the district attorney directed and controlled the subsequent investigation. During the investigation, State police detectives, acting on the district attorney's behalf, solicited voluntary DNA samples from numerous male residents of Cape Cod for purposes of comparison with the biological evidence from the crime scene.

A State police detective approached Amato requesting such a sample in January or February of 2002. The detective assured Amato that if his DNA sample did not match the crime scene evidence, his sample and related records would be destroyed and would not become part of any State or Federal database. Relying on this promise, Amato consented to provide a voluntary saliva swab for DNA analysis. Between 150 and 200 other men, relying on similar promises, consented to provide voluntary DNA samples.

The State police sent these samples to the crime lab. The crime lab analyzed these samples, producing DNA profiles. The crime lab compared those DNA profiles to the profiles that resulted from its analysis of the biological evidence recovered from the crime scene. Amato's DNA profile did not match.

The DNA profile of Christopher McCowen, another man who consented to provide a voluntary DNA sample, matched the crime scene DNA profile. He was arrested on April 14, 2005. In

---

[4] We affirm the dismissal of the claims against the other defendants. See notes 10, 18, and 23, *infra*.

[5] "[J]udicial notice can be taken by trial and appellate courts." *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 69 n.9 (1997). See Mass. G. Evid. § 201 (2011), and cases cited. In particular, we may take judicial notice of facts and proceedings recited in prior judicial opinions. See *Matter of Welansky*, 319 Mass. 205, 210 (1946), and cases cited; *Camara* v. *Board of Appeals of Tewksbury*, 40 Mass. App. Ct. 209, 211 (1996), and cases cited.

November, 2006, during McCowen's subsequent trial, Amato contacted the district attorney to inquire about the status of the sample he had provided more than four years earlier. The district attorney instructed Amato to inquire again after the completion of McCowen's trial.

After a Superior Court jury convicted McCowen in November, 2006, Amato again contacted the district attorney, who orally represented to Amato that his DNA sample had been destroyed. The district attorney declined to provide written details of the handling of the sample. Amato wrote to the district attorney requesting some written record of the treatment of his DNA sample. There was no reply.

On November 21, 2006, the district attorney issued a press release announcing the option for men who had consented to provide voluntary DNA samples between January, 2005, and March, 2005, to retrieve them. The press release announced that samples not retrieved by a certain date would be destroyed. A Cape Cod Times newspaper article reporting on the press release quoted the district attorney as saying, "I said a long time ago that I would do this [return the voluntarily provided DNA samples]." Neither the press release nor the district attorney mentioned DNA samples, like Amato's, voluntarily provided between January, 2002, and January, 2005, or after March, 2005.

Over the next ten months, Amato wrote once to the Attorney General and, through counsel, twice to the acting director of the crime lab. In all three letters, Amato sought confirmation that the crime lab had destroyed his DNA sample and any accompanying records. In November, 2007, the acting director of the crime lab finally replied. She represented that (1) the crime lab had custody of the sample and associated records; (2) the crime lab had not and would not enter Amato's DNA profile into the State convicted offender database[6] or the combined DNA index system (CODIS) maintained by the Federal Bureau of Investigation (FBI); and (3) the crime lab could not release or destroy the DNA sample or the associated records without the district attorney's authorization.

Amato, through counsel, wrote to the district attorney request-

---

[6]Relevant background of the statute that established the State DNA database, G. L. c. 22E, §§ 1-15, appears in *Landry* v. *Attorney Gen.*, 429 Mass. 336, 337-341 (1999), cert. denied, 528 U.S. 1073 (2000).

ing that he authorize the crime lab to destroy the DNA sample and associated records of Amato and others who consented to provide DNA samples in similar circumstances. Amato also wrote to the Undersecretary of Forensic Sciences (undersecretary) of the Executive Office of Public Safety and Security (EOPSS) requesting promulgation of regulations regarding treatment and eventual destruction of voluntarily provided DNA samples. Both letters went without reply.

Amato filed this action in June, 2008, against the district attorney, the crime lab, EOPSS, and the undersecretary. His amended complaint asserted three claims: (1) a FIPA violation, G. L. c. 66A; (2) invasion of statutory privacy rights, G. L. c. 214, § 1B; and (3) breach of contract. After the filing, the district attorney returned Amato's DNA sample sometime in October, 2008. The district attorney has not returned other voluntarily provided DNA samples, and the crime lab continues to hold the DNA profiles and other records of the samples given by Amato and the other men.

Upon the defendants' rule 12(b)(6) motion, the judge, in a thoughtful, comprehensive memorandum of decision, dismissed all three claims against all the defendants. This appeal followed.[7]

2. *Standard of review.* We review the decision to dismiss Amato's complaint de novo,[8] accepting as true all allegations in the complaint and drawing any reasonable inferences in the plaintiff's favor. *Curtis* v. *Herb Chambers I-95, Inc.*, 458 Mass. 674, 676 (2011). "[W]e look beyond the conclusory allegations in the complaint and focus on whether the factual allegations plausibly suggest an entitlement to relief." *Ibid.*

3. *Discussion.* The district attorney, confronting a challenging investigation, asked over 100 men to provide DNA samples voluntarily. Amato and the others had a reasonable expectation

---

[7]On December 10, 2010, after briefing but before argument in this court, the Supreme Judicial Court affirmed McCowen's conviction. See generally *Commonwealth* v. *McCowen, supra.* McCowen did not seek certiorari review by the Supreme Court of the United States pursuant to 28 U.S.C. § 1257(a) (2006). Accordingly, McCowen's case is no longer pending on direct review. Neither party has apprised us of any filing by McCowen seeking collateral review, whether pursuant to Mass.R.Crim.P. 30, as appearing in 435 Mass. 1501 (2001), or 28 U.S.C. § 2254 (2006).

[8]Although our review of the record is de novo, and we review the record independently, we are greatly assisted by the judge's thoughtful memorandum of decision.

of privacy in the bodily fluids they contributed and, accordingly, a constitutional right to be free from such a search absent a warrant issued upon a showing of probable cause. See *Jansen, petitioner*, 444 Mass. 112, 120-121 (2005); *Commonwealth* v. *Cabral*, 69 Mass. App. Ct. 68, 72 (2007). See also *Horsemen's Benevolent & Protective Assn.* v. *State Racing Commn.*, 403 Mass. 692, 700 (1989) ("an individual has reasonable expectations of privacy regarding the information which can be extracted from a urine specimen"); *Guiney* v. *Police Commr. of Boston*, 411 Mass. 328, 332 (1991) ("This court has never approved the nonconsensual taking of blood or urine of a person in the absence of a demonstrated, particularized basis for doing so"). Amato has pleaded, and we take as true, that he and the other men consented to such a search based on promises, made by the district attorney through the State police detectives acting on his behalf, of limited use and retention of the samples provided and the resulting records.

Clearly, the district attorney's innovative approach worked. The perpetrator, McCowen, voluntarily provided biological evidence that matched that from the crime scene. He has been successfully prosecuted, and the conviction has withstood appellate scrutiny. But now that the difficult investigation has concluded, Amato has pleaded, and we take as true, that the defendants have broken their limited use and retention pledges to him and the others.

In response, the defendants assert a variety of arguments that, if accepted, would make the breaking of their pledges to Amato and the others per se reasonable and immune from judicial consideration. Given the circumstances under which the defendants induced Amato and the others to allow access to this intensely private information, including the promises of limited use and retention and the concomitantly restricted scope of consent granted, we are not convinced that the defendants have acted reasonably as matter of law.

Accordingly, we conclude that Amato may pursue his claims for equitable relief. We discuss each individual claim in turn.

a. *Fair Information Practices Act*. General Laws c. 66A, § 2(*l*), inserted by St. 1977, c. 691, § 12, provides, in relevant part, that government agencies shall "not collect or maintain more

personal data than are reasonably necessary for the performance of [their] statutory functions." Any agency "which violates . . . any of the provisions of [G. L. c. 66A] shall be subject to an action for injunction, declaratory judgment, or mandamus." G. L. c. 214, § 3B, inserted by St. 1975, c. 776, § 3. Because Amato's factual allegations plausibly suggest that the district attorney and the crime lab have violated G. L. c. 66A, § 2(*l*),[9] he may pursue the equitable remedies authorized by G. L. c. 214, § 3B.[10]

Violations of any provision of FIPA give rise to a cause of action by a "data subject," G. L. c. 66A, § 1, to enforce the statute, G. L. c. 214, § 3B. See *Tivnan* v. *Registry of Motor Vehicles*, 50 Mass. App. Ct. 96, 98-99 (2000). Once a data subject credibly alleges a FIPA violation, the burden falls on the agency to make an evidentiary showing justifying its action as to the individual data subject. See *Torres* v. *Attorney Gen.*, 391 Mass. 1, 9-11 (1984); *Doe* v. *Registrar of Motor Vehicles*, 26 Mass. App. Ct. 415, 418 (1988).

Here, Amato has pleaded that the defendants collected his DNA profile and other associated records in 2002, some nine years ago; when he consented to provide a DNA sample, he was assured that it and any associated records would be promptly destroyed if the DNA analysis did not match the crime scene evidence; notwithstanding this promise, the defendants reversed their position and presently maintain these records after the completion of their statutory function of securing McCowen's conviction; and, finally, by keeping these records, the defendants, in essence, maintain a shadow DNA database outside the statutorily authorized State convicted offender database governed by G. L. c. 22E, and the FBI's CODIS database.

These allegations, taken as true, plausibly suggest that the

---

[9]We agree with the judge that, because Amato has sought destruction, rather than disclosure, of the DNA sample and associated records, the defendants have not violated G. L. c. 66A, § 2(*i*).

[10]Amato also pleaded that EOPSS and the undersecretary had violated G. L. c. 66A, § 3, by failing to promulgate regulations sufficient to carry out FIPA's purposes with respect to the treatment of DNA samples submitted outside the parameters of G. L. c. 22E. The judge dismissed this claim, and Amato did not argue the matter in this court. Accordingly, we do not address it. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

defendants have maintained more personal data[11] than reasonably necessary to carry out their statutory functions. The defendants, however, argue that their retention of Amato's DNA profile and other records is reasonable as matter of law because (1) G. L. c. 66A, § 2(*l*), does not require an agency to destroy or return personal data when no longer reasonably necessary; (2) the Massachusetts Statewide records retention schedule (retention schedule) sets forth per se reasonable retention periods for homicide investigation records and crime lab case records; and (3) "nothing in FIPA requires the [defendants] to litigate the merits of a pending criminal appeal in a collateral civil action." We are not persuaded.

First, we reject the defendants' argument that G. L. c. 66A, § 2(*l*), addresses only unreasonable collection, not maintenance, of personal data, and, accordingly, imposes no obligation to destroy or return personal data after a reasonable time. The statute prohibits *both* unreasonable collection *and* unreasonable maintenance. G. L. c. 66A, § 2(*l*). In the face of its plain language, we cannot artificially limit the statute's operation to acts of collection. *Guzman* v. *Commonwealth*, 458 Mass. 354, 361 (2010) ("Unless the plain meaning of the statute requires it, we will not expand or limit its meaning"). The defendants' interpretation would also have us read out the word "maintain." This, too, we may not do.[12] *Commonwealth* v. *Millican*, 449 Mass. 298, 300 (2007).

---

[11]To the extent that the defendants argue that Amato's DNA profile and other records are not "personal data" as defined by G. L. c. 66A, § 1, an argument raised for the first time in this court in a footnote of the defendants' brief, we do not consider it. "We do not consider issues, arguments, or claims for relief raised for the first time on appeal." *Cariglia* v. *Bar Counsel*, 442 Mass. 372, 379 (2004). Moreover, "[a]rguments relegated to a footnote do not rise to the level of appellate argument." *Commonwealth* v. *Lydon*, 413 Mass. 309, 317-318 (1992), citing Mass.R.A.P. 16(a)(4).

[12]The defendants point to certain legislative history which comments that the Legislature added this provision in order to "[k]eep data *collection* to a minimum" (emphasis added). Special Legislative Commission on Privacy, Second Interim Report, 1977 House Doc. No. 6106, at 19. We "will not engage . . . in an analysis of a statute's legislative history to seek justification for a particular construction, where the statutory language at issue suggests no ambiguity of meaning." *Thurdin* v. *SEI Boston, LLC*, 452 Mass. 436, 449 (2008), quoting from *Massachusetts Community College Council MTA/NEA* v. *Labor Relations Commn.*, 402 Mass. 352, 354 (1988). Because the statute's

"Maintain" means, as relevant here, "to continue (something)" or "[t]o continue in possession of (property, etc.)." Black's Law Dictionary 1039 (9th ed. 2009). A statutory requirement that an agency cannot "maintain more personal data than are reasonably necessary" therefore demands that the agency not continue in possession of personal data when doing so is no longer reasonably necessary. The statute therefore permits Amato to seek the remedy of return or destruction of his allegedly unreasonably-maintained DNA profile and associated records.

Second, the defendants argue that the retention schedule, a document promulgated by the records conservation board (board)[13] pursuant to G. L. c. 30, § 42, sets forth retention periods which, for FIPA purposes, constitute a per se reasonable time to maintain the records.[14] We disagree. The retention schedule is not a regulation as defined by G. L. c. 30A, § 1(5).[15] It lacks the force and effect of law. See *Global NAPs, Inc.* v. *Awiszus*, 457 Mass. 489, 496-497 (2010); *Golchin* v. *Liberty Mut. Ins. Co.*, 460 Mass. 222, 230 (2011). Contrast, e.g., *Solomon* v. *School Comm. of Boston*, 395 Mass. 12, 16 (1985). The retention schedule must therefore yield to a duly enacted statute like FIPA.[16] *Global NAPs,*

duly enacted text unambiguously prohibits both unreasonable collection and unreasonable maintenance, we do not analyze the legislative history.

[13]The members of the board include "[t]he state librarian, the attorney general, the state comptroller, the commissioner of administration, the supervisor of public records and the chief of the archives division in the department of the state secretary . . . or persons designated by them." G. L. c. 30, § 42, as amended by St. 1973, c. 1050, § 1A.

[14]The records at issue here might qualify in any of several categories listed in the retention schedule. The defendants have avoided taking a position on the appropriate classification of the records. This reticence has not assisted the resolution of this complex case.

[15]The defendants concede as much by referring to the retention schedule as a "*quasi*-regulatory standard[]" (emphasis added). Moreover, even in the absence of this concession, we would still conclude that, because the retention schedule concerns only the internal management of State agencies and does not affect the rights of or procedures available to the public, it cannot be a formal "regulation." See G. L. c. 30A, § 1(5). Finally, the retention schedule states "[t]his schedule is produced under the statutory provisions of [G. L. c. 30, § 42], [G. L. c. 66, § 1], [G. L. c. 66, § 8], [G. L. c. 9, § 2,] and [G. L. c. 4, § 7(26)]." The retention schedule neither states nor intimates that it is a regulation within the meaning of G. L. c. 30A, § 1(5), or that its promulgation conformed to the rule making procedures contained in G. L. c. 30A, §§ 2-3.

[16]We hold only that the retention schedule does not foreclose Amato's claim as matter of law. This is not to say that the retention schedule may not

*Inc.* v. *Awiszus, supra.* See *Massachusetts State Pharmaceutical Assn.* v. *Rate Setting Commn.*, 387 Mass. 122, 127 (1982); *Solomon* v. *School Comm. of Boston, supra.*

Third, the defendants argue that FIPA does not require them to defend, in litigation, their decision to retain these records while the underlying criminal matter is pending on direct appeal. Assuming without deciding that the defendants' argument is correct, the argument is now moot because the underlying criminal matter is no longer pending on direct review.[17] See *Mancuso* v. *Massachusetts Interscholastic Athletic Assn.*, 453 Mass. 116, 133 n.31 (2009).

b. *Invasion of privacy.*[18] The statute governing invasion of privacy claims, G. L. c. 214, § 1B, inserted by St. 1974, c. 193, § 1, provides:

> "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

"[T]he Legislature appears to have framed [G. L. c. 214,

be relevant, as the case progresses on remand, to whether the defendants' continued maintenance of Amato's DNA information is reasonable. Cf. *Torres* v. *Attorney Gen.*, 391 Mass. at 9 ("Thus the same information . . . might be protected from disclosure as an unwarranted invasion of privacy in one context and not in another").

[17]The defendants also raise the potential for postconviction collateral review which may question the completeness or accuracy of the records from the Worthington investigation. The defendants have an interest in preserving sufficiently complete records to defend against potential future collateral proceedings. But the defendants do not argue that this interest makes indefinite retention of all records associated with a criminal conviction per se reasonable. Instead, the defendants fall back on the retention schedule's prescriptions for minimum preservation periods as per se reasonable. Given our resolution of the effect of the retention schedule, see discussion, *supra*, it is for the judge, in the first instance, weighing the defendants' interests against Amato's, to determine whether the defendants' continued maintenance of these records is "reasonably necessary" to defend against collateral proceedings in the Worthington case.

[18]Amato also asserted his G. L. c. 214, § 1B, claim against EOPSS and the undersecretary. The judge did not address the claim against EOPSS or the undersecretary separately. Amato limited his argument in this court to the dismissal of this claim against the district attorney and the crime lab and did not address EOPSS or the undersecretary. Accordingly, we do not address the claim against EOPSS or the undersecretary. See Mass.R.A.P. 16(a)(4).

§ 1B,] in broad terms so that the courts can develop the law thereunder on a case-by-case basis, by balancing relevant factors . . . and by considering prevailing societal values and the ability to enter orders which are practical and capable of reasonable enforcement" (citation omitted). *Schlesinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 519 (1991). Most G. L. c. 214, § 1B, cases involve "public disclosure of private facts." *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 382 n.16 (2005), cert. denied sub. nom. *Globe Newspaper Co.* v. *Ayash*, 546 U.S. 927 (2005). In such cases, the plaintiff must prove that disclosure or dissemination occurred. See *id.* at 382.

The statute proscribes other conduct as well. See *id.* at 382 n.16; *Schlesinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, supra at 519-520; Prosser & Keeton, Torts § 117, at 851-866 (5th ed. 1984). See also *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 307 & n.9 (1982); *Bratt* v. *International Bus. Machs. Corp.*, 392 Mass. 508, 517 n.14 (1984). Such conduct includes unreasonable intrusion upon a person's right to seclusion. *Ayash* v. *Dana-Farber Cancer Inst.*, supra. Pursuing a G. L. c. 214, § 1B, claim on this theory does not require proof of dissemination.[19] See *id.* at 382 n.16; *Schlesinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, supra at 517.

DNA information is highly sensitive. Citizens have a reasonable expectation of privacy in such information. See *Landry* v. *Attorney Gen.*, 429 Mass. 336, 354 n.20 (1999), cert. denied, 528 U.S. 1073 (2000) (upholding State convicted offender database created by G. L. c. 22E as constitutional; however, "the indefinite storage of the entire DNA sample . . . creates some concern that the samples could be misused at some point in the future to search for and disclose *private genetic information*" [emphasis added]).[20] See also *Horsemen's Benevolent & Protective Assn.* v. *State Racing Commn.*, 403 Mass. at 700 (discussing

---

[19]To the extent that the defendants rely on the language of *Bratt* v. *International Bus. Machs. Corp.*, 392 Mass. at 518, which states that G. L. c. 214, § 1B, "proscribe[s] the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest," we are not persuaded. The Supreme Judicial Court, in a footnote to the same paragraph, reiterated that publication is *not* an essential ingredient of the tort of invasion of privacy. *Id.* at 517 n.14.

[20]Although the defendants have returned Amato's sample, he has pleaded

sensitive information discoverable through urinalysis); *Commonwealth* v. *Cabral*, 69 Mass. App. Ct. at 72, and cases cited. Amato has pleaded that the defendants continue to hold this highly sensitive information beyond the scope of the limited consent he gave at the time he provided the sample. Contrast *O'Connor* v. *Police Commr. of Boston*, 408 Mass. 324, 329-331 (1990). Amato has also pleaded that the defendants' retention of up to 200 DNA profiles constitutes a shadow DNA database,[21] with its constituent records available for disclosure by comparison in other criminal investigations.

The allegations that the defendants have retained Amato's highly sensitive DNA records without his consent and made them available for nonconsensual use in other criminal investigations are sufficient to constitute an unreasonable,[22] substantial, and serious interference with Amato's privacy. These allegations therefore suffice to state a G. L. c. 214, § 1B, claim.

c. *Breach of contract.* The district attorney and the crime lab[23] argue that, in light of the requirements of the retention schedule, the State police detective who promised Amato the limited use and retention of his DNA sample and associated records lacked authority to bind the defendants. The defendants further argue that, in the absence of such authority, estoppel

---

that the defendants retain his private genetic information. Taking the pleadings as true, we conclude that the potential for the misuse identified in *Landry* remains.

[21]We note that, by necessary implication, Amato also alleges that the defendants' retention is not subject to safeguards against disclosure, such as the criminal sanctions for unauthorized disclosure or acquisition of information in the State convicted offender database provided by G. L. c. 22E, §§ 12-13.

[22]The defendants argue that the maintenance periods set out in the retention schedule are, as matter of law, what constitutes "reasonable" interference with Amato's privacy. As with Amato's FIPA claim, we conclude that the nonbinding retention schedule cannot define what is per se reasonable for G. L. c. 214, § 1B, purposes. See discussion, *supra*. To the extent that the defendants rely on the crime lab's DNA unit quality assurance manual to determine what is per se reasonable for G. L. c. 214, § 1B, purposes, the argument fails for the same reasons it failed as to the retention schedule: the document neither is nor purports to be a regulation within the meaning of G. L. c. 30A, § 1(5); lacks the force and effect of law; and must yield to a duly enacted statute like G. L. c. 214, § 1B. The crime lab's quality assurance standards may be relevant to the issues at trial, but, like the retention schedule, they are not dispositive.

[23]This claim is not asserted against EOPSS or the undersecretary.

principles cannot apply to bind the defendants to the detective's promise. Because we conclude that the detective had the authority to promise as he did, we disagree.[24]

The detective, acting in the course of the district attorney's investigation, see G. L. c. 38, § 4, second par., had the authority to bind the defendants to the scope of consent granted to search. "[I]t is *a suspect's* right to limit the scope of a search to which he consents" (emphasis added). *Commonwealth* v. *Gaynor*, 443 Mass. 245, 256 (2005), citing *Florida* v. *Jimeno*, 500 U.S. 248, 252 (1991). The defendants' argument that a law enforcement officer's promise to a suspect cannot bind his superiors would render this right to limit consent to a search meaningless.[25] See *ibid*. See also *id*. at 253 ("a warrant [is] required for a search and seizure for purposes beyond the self limiting representation of police"). We therefore reject the defendants' argument as to the scope of the detective's authority and hold that Amato has adequately stated a breach of contract claim.[26]

4. *Conclusion.* The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*

[24]Accordingly, any argument related to the impermissible application of estoppel against the sovereign is irrelevant.

[25]We also find persuasive authority in the plea bargain context, where we have said "[i]t is, perhaps, more compelling that a public pledge be redeemed than a private one." *Doe* v. *District Attorney for the Plymouth Dist.*, 29 Mass. App. Ct. 671, 673 (1991). In that context, the Commonwealth must persuade a great many criminal defendants to give up their rights to confrontation, a jury trial, and so on in order for the criminal justice system to work. In view of the significance of the rights sacrificed and the policy merits of plea bargaining, "when a plea rests in any significant degree on a promise or agreement of the prosecutor . . . such promise must be fulfilled." *Santobello* v. *New York*, 404 U.S. 257, 262 (1971). Given the constitutional dimension of the rights sacrificed in consent searches and the policy merits of encouraging such consent, this principle applies here to give binding effect to promises limiting the use of the fruits of such searches.

[26]Even if we accepted the defendants' argument about the scope of the detective's authority, our result would not change. Amato included in his pleadings the district attorney's public statement that "I said a long time ago that I would [return the voluntarily provided DNA samples]." It is reasonably inferable from this statement that the district attorney authorized State police detectives to make the promises which Amato alleges the detective to have made to him.