DAWN M. ALLEN, administratrix,[1] & others[2] vs.
HOLYOKE HOSPITAL & others.[3]

Hampshire. February 6, 1986. — September 3, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Evidence,* Privileged communication. *Social Worker. Fair Information Practices Act,* Availability of remedy. *Department of Social Services. Privacy.*

In an action by the natural parents of a child who had been placed in foster care, seeking damages from a hospital and others for the child's wrongful death, the statutory privilege for communications to social workers, created by G. L. c. 112, § 135, precluded the defendants from obtaining pretrial discovery of records of the Department of Social Services relating to communications made to the department's social workers by the deceased child's grandparents, with whom he did not reside, and by his foster parents. [376-378] LIACOS, J., with whom ABRAMS & LYNCH, JJ., join, dissenting. ABRAMS, J., with whom LIACOS & LYNCH, JJ., join, dissenting.

The statutory privilege for communications to social workers, created by G. L. c. 112,. § 135, did not extend to the records of a social worker's personal observations in the home of the natural parents of a child who was placed in foster care by the Department of Social Services. [378]

The natural parents of a child who had been placed in foster care by the Department of Social Services did not waive their right to invoke the statutory privilege for communications to social workers, created by G. L. c. 112, § 135, by commencing an action for the child's wrongful death, which raised issues to which the department's records of such communications would be relevant. [378]

---

[1] Of the estate of Sean Allen.

[2] Christopher L. Allen and Dawn M. Allen, individually. In this opinion, the term "plaintiff" refers to plaintiff Dawn M. Allen, individually.

[3] Robert Slocum, Howard Gold, Robert M. Abrams, and Holyoke Pediatric Associates. Cooley Dickerson Hospital, originally named as a defendant, was dismissed from the case after the plaintiff failed to post a bond following a determination for Cooley Dickerson Hospital by a medical malpractice tribunal under G. L. c. 231, § 60B (1984 ed.).

In response to a reported question of law relating to litigants' right to obtain pretrial discovery of certain records of the Department of Social Services, this court concluded that G. L. c. 66A, the Fair Information Practices Act, would apply to the records of a social worker's personal observations in the home of the natural parents of a child who was placed in foster care, and that the issue was for the trial judge to determine, on remand, whether disclosure of the information would be an unwarranted invasion of the parents' privacy. [381-382]

CIVIL ACTION commenced in the Superior Court Department on February 3, 1984.

Questions of law were reported to the Appeals Court by *John F. Moriarty*, J. The Supreme Judicial Court transferred the case on its own initiative.

*Charles M. Burnim* (*Alan R. Goodman* with him) for the plaintiffs.

*Michael H. Burke* (*George W. Marion* with him) for Holyoke Hospital.

*Gerald Glasser & Dana M. Goldman*, for Robert M. Abrams & another, were present but did not argue.

HENNESSEY, C.J. A Superior Court judge has reported two questions pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974), regarding whether the social worker privilege contained in G. L. c. 112, § 135, and the provisions of the Fair Information Practices Act (FIPA), G. L. c. 66A (1984 ed.), preclude the defendants from examining certain records of the Department of Social Services (department) relating to the decedent. The defendants seek to examine the department's records to aid in defending a wrongful death action alleging that the defendants negligently caused the decedent's death. We transferred the case here on our own motion.

On February 5, 1981, the decedent, Sean Allen, a four year old boy, was brought to Holyoke Pediatric Associates by his foster mother. He was immediately rushed to Holyoke Hospital where he remained in critical condition for several hours. Later that same day, the decedent's condition, while still critical, was showing signs of improvement. At approximately 2:30 A.M. on February 6, however, the decedent's condition deteriorated, and he expired at 4:20 A.M. The cause of death was

later determined to be septic shock secondary to pyelonephritis (kidney infection).

The decedent was born on January 18, 1977. Information obtained through pretrial discovery indicates that the decedent was an unusually small, underdeveloped, and sickly child throughout his short life. On January 13, 1978, the decedent and his older brother were removed from the custody of their mother, the plaintiff in the action with which this interlocutory report is concerned, by the department for approximately six months. The department again removed the decedent and his brother from the plaintiff's custody on December 3, 1980. At that time the decedent was placed with foster parents, with whom he was living at the time of his death.

Following the child's death, the natural mother, Dawn M. Allen, commenced this action against the defendants on February 3, 1984, seeking recovery for conscious pain and suffering, wrongful death, punitive damages for wrongful death, emotional distress, and loss of companionship and society. Each of the defendants raised the defense of the contributory negligence of the plaintiff based on the allegedly deficient care and nurturing the decedent received during the early years of his life. The defendant, Holyoke Hospital, sought to depose the department's area director in Northampton. In its notice of taking the deposition, Holyoke Hospital requested that the deponent bring with him any department files relating to the Allen family, including "all documents relating to any proceedings brought by or otherwise involving the Department of Social Services relating to the removal of Sean Allen [or his brother] from the custody of their parents Dawn M. Allen and/or Terry D. Allen." The plaintiff renewed an earlier motion for a protective order in opposition to this effort to gain discovery of the department's records. In support of this motion, the plaintiff maintained that the information in the department's files is not subject to discovery because the information is within the privilege created by G. L. c. 112, § 135, for communications to social workers (social worker privilege) and because disclosure of the information is forbidden by the provisions of FIPA.

After reviewing the relevant department records in camera, the judge found that the records contained information which "would probably be of great assistance to [the defendants] in warding off the claims which the plaintiff has brought against them." Specifically, the judge found that the information "might bear upon the cause of the decedent's illness and death . . . and that it might bear on the issue of the monetary value to the plaintiff and the decedent's father of the child's society and companionship." See G. L. c. 229, § 2 (1984 ed.). The judge also found that "[t]he defendants' need is substantial . . . ."

Pursuant to Mass. R. Civ. P. 64, the judge elected to report certain questions, as follows: "(1) Is a licensed social worker in the employ of the Massachusetts Department of Social Services precluded by the provisions of G. L. c. 112, section 135 from disclosing information relative to a child who was the subject of a departmental investigation which the social worker acquired: (a) from the child's maternal grandparents with whom the child did not reside; (b) from the child's foster parents with whom the child had been placed by the department; and (c) from the social worker's personal observations made within the home of the child's parents in the course of the investigation? (2) Is the Department of Social Services precluded, by the provisions of G. L. c. 66A, from allowing access to materials or data in its files, which relate to a specifically named individual, to the defendants in a civil action seeking damages for the alleged wrongful death of that individual, where such materials or data contain information which would probably be of substantial assistance to those defendants in defending against the claims brought against them and where such material and data are not otherwise specifically or by necessary implication exempted from disclosure by statute." We examine separately the availability of the department's records under G. L. c. 112, § 135, and FIPA, bearing in mind that information contained in the records should not be disclosed if disclosure is precluded by either statute.

1. *Disclosure Under the Social Worker Privilege Created by G. L. c. 112, § 135.*

In defending the wrongful death action initiated by the plaintiff, the defendants seek to examine the department's records relating to the decedent to obtain whatever information is available regarding his condition prior to his death, his condition when he was removed from his mother, and to what extent, if any, the plaintiff's parental neglect may have contributed to the child's illness and death or may be a ground for reducing the plaintiff's damages. The defendants contend that the social worker privilege does not protect these records from disclosure and, alternatively, that by instituting a civil action raising issues to which the records are relevant, the plaintiff has waived any privilege to which the records may ordinarily be subject.

To determine whether the records can be disclosed to the defendants, it is necessary to examine the scope of the statutory privilege for communications to social workers created in G. L. c. 112, § 135.[4] Section 135 of c. 112 prohibits a social worker,

---

[4] Section 135, as appearing in St. 1985, c. 524, reads as follows: "No social worker in any licensed category, including those in private practice, and no social worker employed in a state, county or municipal governmental agency, shall disclose any information he may have acquired from a person consulting him in his professional capacity or whom he has served in his professional capacity except:

"(*a*) with the written consent of such person or, in the case of death or disability of such person, of his representative, other person authorized to sue, or the beneficiary of an insurance policy on his life, health, or physical condition;

"(*b*) that a licensed certified social worker, including one engaged in independent clinical practice, licensed social worker, licensed social work associate, or a social worker employed in a state, county, or municipal agency, shall not be required to treat as confidential a communication that reveals the contemplation or commission of a crime or harmful act;

"(*c*) when the person waives the privilege by bringing charges against the licensed certified social worker, including one engaged in independent clinical practice, the licensed social worker, the licensed social work associate or by a social worker employed in a state, county, or municipal agency;

"(*d*) to initiate a proceeding under subsection C of section twenty-three of chapter one hundred and nineteen or section twenty-four of said chapter one hundred and nineteen, or section three of chapter two hundred and ten and give testimony in connection therewith;

except in certain specified circumstances, from disclosing information acquired from persons consulting the social worker in a professional capacity. In enacting § 135, the Legislature recognized that maintaining the confidentiality of communications acquired by a social worker is necessary for successful social work intervention. *Commonwealth* v. *Collett,* 387 Mass. 424, 428 (1982).

In *Collett,* we recited the history of the statute as supportive of our conclusion that the privilege extends beyond communications from the victim and the victim's family, and we further concluded that it is only necessary that the communications have been acquired from persons consulting the social worker in her professional capacity. 387 Mass. at 428-430. See *Commonwealth* v. *LeCain,* 19 Mass. App. Ct. 1034, 1035 (1985). We said further that persons "consulting" the social worker included those who were first contacted by the social worker, who "generally makes the first foray." *Collett, supra* at 429. Subsequent to our *Collett* decision, in St. 1985, c. 524, the Legislature reenacted § 135 with a significant change in wording relevant to this aspect of our discussion. In pertinent part § 135 now reads: "No social worker . . . shall disclose any information he may have acquired from a person consulting him in his professional capacity *or whom he has served in his professional capacity* . . ." (emphasis supplied to show words added by amendment). We regard the reenactment as indicating that the Legislature agrees with our statutory interpretation in *Collett* (see *Commonwealth* v. *Miller,* 385 Mass. 521, 524 [1982]; *Condon* v. *Haitsma,* 325 Mass. 371, 373 [1950]), and that the language emphasized above is especially supportive of our conclusions in that case.

---

"(*e*) in any other child custody case in which, upon a hearing in chambers, the judge, in the exercise of his discretion, determines that the social worker has evidence bearing significantly on the person's ability to provide suitable custody, and that it is more important to the welfare of the child that the information be disclosed than that the relationship between the person and social worker be protected;

"(*f*) where the social worker has acquired the information while conducting an investigation pursuant to section fifty-one B of chapter one hundred and nineteen."

Taking into account our conclusions in *Collett,* the response to questions (1) (a) and (1) (b) must be in the affirmative. Communications to the department's social workers from the decedent's grandparents and foster parents while consulting with the social workers fall within the privilege created by c. 112, § 135, unless one of the statutorily enumerated exceptions to the privilege applies to the communications involved.[5]

Regarding the disclosure of information contained in the department's records acquired through the personal observations of social workers in the plaintiff's home, we reach a different result. The language of § 135 clearly limits the privilege to communications "from a person," and the observations of the social worker are clearly not such.

The defendants argue that, by bringing this action and putting certain facts directly in issue, the plaintiff has waived any privilege under c. 112, § 135, with respect to information bearing on those facts. We disagree. The statutory language makes it clear that the privilege to have confidences respected belongs to those persons who make disclosures, and only they can waive them. See G. L. c. 112, § 135 (*a*).

Our answers to the questions concerning G. L. c. 112, § 135, are as follows: (1) (a), "Yes"; (1) (b), "Yes"; (1)(c), "No."

2. *Availability of Records Under FIPA.*

Question (2) asks us to decide whether the provisions of G. L. c. 66A (FIPA) operate to bar the defendants' access to information contained in the files of the Department of Social Services. In light of our conclusions in questions (1) (a) and

---

[5] We do not discuss whether any of the exceptions in § 135 applies (e.g., exception [*b*] as to "harmful acts"; see note 4 *supra*), because the reported questions make no mention of the exceptions, and because the judge's memorandum explaining his reasons for reporting the questions says that the statutory exceptions are "immaterial" to this case.

We add that, although the reported questions address only communications from grandparents and foster parents, the judge's memorandum states that some communications in the department's records came from police, teachers, neighbors, and others. Against the possibility that issues concerning such individuals may arise in this case, we comment that these confidential communications to social workers also fall within the privilege created by § 135 if the communications were received during consultations with the social workers.

(1) (b) that disclosure is precluded, we construe question (2) (see the words of that question which confine the inquiry to matter "not otherwise specifically or by necessary implication exempted from disclosure by statute") as inquiring only whether disclosure of the information covered by question (1)(c) is barred by FIPA. Our discussion will show that on this record we cannot give a definitive answer to this question.

FIPA requires that every holder of personal data,[6] "not allow any other agency or individual not employed by the holder to have access to personal data unless such access is authorized by statute or regulations . . . or is approved by the data subject whose personal data are sought." G. L. c. 66A, § 2 (*c*). Information contained in public records is exempted from the definition of "personal data" contained in FIPA. G. L. c. 66A, § 1. Thus, determining whether the record sought is protected by FIPA depends on whether the record is a public record pursuant to G. L. c. 4, § 7, Twenty-sixth, and subject to the disclosure provisions of G. L. c. 66A. *Torres* v. *Attorney Gen.*, 391 Mass. 1, 7 (1984). "[I]f a record is made public by the public records law, the personal data in it would not be covered by FIPA." Special Legislative Commission on Privacy — Second Interim Report, 1977 House Doc. No. 6106, at 12. See *Torres, supra* at 7 n.9.

The defendants' argument that disclosure of the records is not prohibited by FIPA because § 2 (*k*) contemplates disclosure of personal data in response to a demand for data by means of compulsory process is not persuasive. Section 2 (*k*) of G. L. c. 66A requires record holders to "maintain procedures to ensure that no personal data are made available in response to

---

[6] "Personal data" are "any information concerning an individual which, because of name, identifying number, mark or description can be readily associated with a particular individual; provided, however, that such information is not contained in a public record, as defined in clause Twenty-sixth of section seven of chapter four and shall not include intelligence information, evaluative information or criminal offender record information as defined in section one hundred and sixty-seven of chapter six." G. L. c. 66A, § 1. The information in the department's records the defendants seek is personal data and is not subject to disclosure unless it falls within the definition of "public records" in G. L. c. 4, § 7, Twenty-sixth.

a demand for data made by means of compulsory legal process, unless the data subject has been notified of such demand in reasonable time that he may seek to have the process quashed." This language does not add to or detract from any substantive right of access to records the parties possess under any other provisions of FIPA or other laws. Section 2 (*k*) is merely an administrative provision that requires agencies maintaining personal data to advise data subjects of a demand for information regarding them so that the data subject would have an opportunity to prevent disclosure. The section does not require that the records be disclosed, but in fact admits a possibility that the records may not be disclosed if the data subject objects to disclosure. Through § 2 (*k*), the Legislature imposed on agencies an obligation to create a procedure to ensure consideration of a data subject's objections to disclosure. The Legislature contemplated that courts would apply the usual rules established by the substantive provisions of FIPA and other records statutes in ruling on demands for disclosure of records or information containing personal data made pursuant to § 2 (*k*). Section 2 (*k*) is not a provision requiring that records be disclosed because litigants request them.

The defendants also argue that they have shown such a substantial need for the records that it outweighs the plaintiff's right of privacy. We do not agree. We decline to construe FIPA's protection against disclosure so narrowly.[7] In reporting the question whether the department's records are protected from disclosure under FIPA, the judge stated that, on the basis of his in camera inspection of the records, "they contain information which, while perhaps not absolutely essential to the defendants' defense, would probably be of great assistance to them in warding off the claims which the plaintiff has brought against them. The defendants' need is substantial, the stakes are high and a trial of the case on its merits promises to be lengthy and expensive." In the *Torres* case, we left undecided

---

[7] Again, as in our answers to question (1), because the judge makes no mention of harmful acts, and the defendants do not argue in that vein, we do not address the issue whether FIPA would protect personal data showing harmful acts by a specifically named individual.

the question whether the reason that personal data are sought can ever warrant an invasion of privacy. We did question, however, "whether the Legislature intended a variable definition . . . depending on the . . . information seeker's need." *Id*. at 10. In addition, we observed that "[i]t may be that the public records law was intended only to make properly maintained information available to members of the public treated collectively and not intended to differentiate among the purposes for which information is requested." *Id*. This view is the position taken by the Federal courts under the Federal Freedom of Information Act. See *Kiraly* v. *FBI*, 728 F.2d 273 (6th Cir. 1984); *Kurzon* v. *Department of Health & Human Servs.*, 649 F.2d 65 (1st Cir. 1981); *Brown* v. *FBI*, 658 F.2d 71 (2d Cir. 1981); *DePlanche* v. *Califano*, 549 F. Supp. 685 (W.D. Mich. 1982); *Columbia Packing Co.* v. *United States Dep't of Agriculture*, 417 F. Supp. 651 (D. Mass. 1976). By claiming a greater need for the information than the general public, the defendants do not enhance their right of access to the records.

Exempted from the definition of public records are "data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy." G. L. c. 4, § 7, Twenty-sixth (*c*). We do not agree with the defendants that, by bringing this action, the plaintiff waived her right to have the information in the department's file protected from disclosure under G. L. c. 66A. In each case where a party to litigation seeks materials arguably protected by FIPA, that party must demonstrate that, based on the particular circumstances of the case, the collective public interest in disclosure warrants an invasion of the data subject's privacy. *Torres, supra* at 11.

It is in part a question of fact whether disclosure of records of the social worker's personal observations made in the home of the child's parents would be an unwarranted invasion of privacy. We do not know the circumstances under which the social worker entered the home nor what the records indicate she saw. We do know that FIPA does not bar the social worker from testifying concerning her observations. Because that infor-

mation is subject to public disclosure, it may well be that disclosure of her recorded observations would not be an unwarranted invasion of the plaintiff's privacy. The question is one as to which the defendants are entitled to a ruling prior to trial and, if their access to the records is denied before trial, circumstances at trial may indicate that the defendants have become entitled to access to the records.

In answer to question (2), we can say that FIPA applies to the information covered by question (1)(c), that the defendants' claims of absolute right to that information must be rejected, and that a judge must decide whether disclosure of that information would be an unwarranted invasion of the plaintiff's privacy. Question (2) is not capable of an affirmative or negative answer.

3. *Conclusion.*

Our responses to the reported questions are as follows: Question (1) (a) "Yes"; Question (1) (b) "Yes"; Question (1) (c) "No." Question (2) is not capable of an affirmative or negative answer.

LIACOS, J. (dissenting, with whom Abrams and Lynch, JJ., join). The court, in response to two questions reported, concludes that discovery in the context of civil litigation may not be had of certain information acquired by a licensed social worker, provided that information falls within the scope of G. L. c. 112, § 135.[1] Thus, the court responds in the affirmative to reported questions (1) (a) and (1) (b). As to question (1) (c), pertaining to information obtained by visual observation, the court responds in the negative. I dissent as to the result the court reaches with regard to questions (1) (a) and (1) (b). I take no position on the proper answer to question 2.

---

[1] The relevant provisions of G. L. c. 112, § 135, as appearing in St. 1985, c. 524, are: "No social worker in any licensed category, including those in private practice, and no social worker employed in a state, county or municipal governmental agency, shall disclose any information he may have acquired from a person consulting him in his professional capacity or whom he has served in his professional capacity . . . ."

Based on his reading of *Commonwealth* v. *Collett,* 387 Mass. 424 (1982), the judge was satisfied that (a) any information obtained by social workers from the plaintiff or from her estranged husband was privileged, and (b) information obtained by social workers from police officers, neighbors, teachers, and informants was not privileged. He was in doubt whether information obtained from the child's grandparents (with whom the child did not reside), and from the child's foster parents, was privileged. Additionally, he was in doubt whether information gained by social workers while visiting the plaintiff's home, not based on verbal communication with the parents, was privileged under G. L. c. 112, § 135. Last, he was concerned whether the department's file could be obtained, in light of the provisions of FIPA. Thus, he reported only those questions as to which he was in doubt. The questions reported are:

"(1) Is a licensed social worker in the employ of the Massachusetts Department of Social Services precluded by the provisions of G. L. c. 112, section 135 from disclosing information relative to a child who was the subject of a departmental investigation which the social worker acquired:

"(a) from the child's maternal grandparents with whom the child did not reside;

"(b) from the child's foster parents with whom the child had been placed by the department; and

"(c) from the social worker's personal observations made within the home of the child's parents in the course of the investigation?

"(2) Is the Department of Social Services precluded, by the provisions of G. L. c. 66A, from allowing access to materials or data in its files, which relate to a specifically named individual, to the defendants in a civil action seeking damages for the alleged wrongful death of that individual, where such materials or data contain information which would probably be of substantial assistance to those defendants in defending against the claims brought against them and where such material and data are not otherwise specifically or by necessary implication exempted from disclosure by statute."

In my view, the proper answers to the first question reported should be: (1) (a), "No"; (1) (b), "No"; (1) (c), "No."

I start with the words of the statute, abiding by the oft-stated principle that " '[t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' *Industrial Fin. Corp.* v. *State Tax Comm'n,* 367 Mass. 360, 364 (1975), quoting from *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934)." *Commonwealth* v. *Collett, supra* at 432. See *Hoffman* v. *Howmedica, Inc.,* 373 Mass. 32, 37 (1977).

Additionally, it is a fundamental principle of statutory construction that each word of a statute should be given its ordinary meaning, and that no word is to be considered surplusage. *Bolster* v. *Commissioner of Corps. & Taxation,* 319 Mass. 81, 84-85 (1946).

General Laws c. 112, § 135, imposes an obligation of confidentiality on a social worker by the words, "[n]o social worker . . . may *disclose* any information . . ." (emphasis supplied). The statutory obligation to maintain confidentiality is not necessarily the equivalent of the creation of a testimonial privilege. *Tower* v. *Hirschhorn,* 397 Mass. 581, 588 n.9 (1986). *Alberts* v. *Devine,* 395 Mass. 59, 67 (1985). *Collett* does not recognize adequately this distinction; indeed, the opinion appears to say that the obligation of confidentiality and a testimonial privilege are the same.[2]

Such an analysis overlooks the significant fact that an obligation not to disclose, quite apart from any testimonial

---

[2] See and compare the language in *Collett* at 426-427, "General Laws c. 112, § 135, prohibits *disclosure,*" with the language, *id.* at 427, "[t]he *privilege* established by c. 112, § 135, is one of several provided by Massachusetts law"; *id.* at 428, "[t]he purpose of enacting a social worker-client *privilege* is to prevent the chilling effect which routine *disclosures* may have in preventing those in need of help from seeking that help . . . . We now consider to whom the *privilege* created by the statute extends." (Emphasis supplied.)

privilege, goes a long way toward achieving the legislative purpose of § 135, as described by the court in *Collett, supra* at 427-428. In my view, § 135 serves a dual purpose. First, it imposes an obligation on a licensed social worker to maintain the confidentiality of "information he may have acquired from persons consulting him in his professional capacity." "Routine disclosures" and open access to such information are thus precluded. Second, the statute recognizes, by its enumerated exceptions, circumstances in which disclosure may be had. See G. L. c. 112, § 135 (*a*) — (*f*). It is significant that of the six enumerated exceptions, several contemplate "disclosure" outside the context of a trial, i.e., without involving the concept of a testimonial privilege at all.[3]

If we postulate that a "privilege" is restricted to confidential communications arising from a social worker-client relationship, see *Collett, supra* at 440-442 (Lynch, J., dissenting), then information acquired ordinarily may not be disclosed, but is not privileged. Thus, it may be revealed in the course of discovery and litigation, without reference to any exception listed under § 135. The proper answer to question (1) (c) is, "No."

Turning next to information acquired from the child's maternal grandparents (question [1] [a]) and from the child's foster parents (question [1] [b]) (and perhaps others such as police officers, teachers, and informants), the key to the statute's mandate is whether such information was obtained from a

---

[3] See, e.g., § 135 (*a*), (*b*), (*d*), and (*f*) (1984 ed. & Supp. 1985). Exception (*b*) clearly has nothing to do with courtroom privileges; instead, it places a duty on the social worker to disclose the "communication that reveals the contemplation or commission of a crime or harmful act."

The significance of the use of the word "information" in the main part of § 135, as contrasted with the excepted "communication" under § 135 (*b*), is a matter I need not discuss at length. *Collett, supra* at 430, fails to note the distinction but engages, instead, in an analysis of the types of communications which may be revealed under § 135 (*b*). *Id.* at 431-432, 434-435. Similarly, the court's opinion in this case seems to treat "information" and "communication" as synonyms. As the dissent by Justice Lynch in *Collett* correctly states, such a construction "gives the 'social worker privilege' a far greater scope than that of any common law or statutory privilege previously recognized." *Collett, supra* at 441 (Lynch, J., dissenting).

person "consulting [the social worker] in his professional ca-
pacity." *Collett,* unfortunately, expands the word "consulting"
by reversing its meaning. A police officer may give informa-
tion, or, so too, may a grandparent or a foster parent, but it
is hard to say that every time a person talks to a social worker
that person is "consulting" the social worker in the sense of
seeking that social worker's advice and assistance. Justice
Lynch's dissent correctly utilized the normal meaning of the
word "consult" when he said, "To 'consult' a social worker
or other professional means, in the common understanding of
the term, to seek that professional's advice or opinion. It is
the confidences of persons *seeking* such advice that the statute
in question was intended to protect" (emphasis in original).
*Collett, supra* at 440. The court here unquestioningly accepts
the strained interpretation of "consult" given in *Collett* — which
appears to say that, by his very status, the social worker "con-
sults" with others and, hence, casts a blanket of confidentiality
and "privilege" wherever he goes.[4]

Additionally, the court overstates the result reached in *Collett*
by stating that, "[i]n *Collett,* we [concluded] . . . that the
privilege extends beyond communications from the victim and
the victim's family . . . ." *Ante* at 377. In *Collett,* we indicated
that the issue was disclosure of communications made to the
social worker "by the defendant [a live-in boy friend], members
of the victim's family and professionals working for other
agencies." *Collett* at 426. Later, we said that "part of the social
worker's professional duties would necessarily involve consult-
ing with *members of the victim's family* and others *closely
connected to the victim's home situation*" and that "[t]he de-
fendant appears to be a person who consulted the social worker
in her professional capacity." (Emphasis supplied.) *Collett* at

---

[4] The blanket of confidentiality the court allows a social worker to cast
over everyone he or she talks to reminds me of a famous comic strip
character. In Al Capp's Li'l Abner, a sad looking fellow named Joe Btfsplk
walked under a constant rain cloud of misfortune which brought bad luck
to all who came near Joe. A. Capp, From Dogpatch to Slobbovia (1964).
The court's view of the social worker privilege has a similar effect on all
who talk to a social worker. Obviously, such an approach makes better
comedy than sound legal doctrine.

429. The court's open-ended language in this case extends the privilege far beyond the mandate of *Collett* and inevitably leads to the erroneous conclusion that "grandparents and foster parents . . . police, teachers, neighbors, and others" all have a "privilege." See *ante* at 378 n.5. Surely, at least in the sense of creating a testimonial privilege, no such obtuse and unique intent should be laid at the Legislature's doorstep. While the information obtained from any source may be deemed confidential, a proper construction of the statute would limit the testimonial privilege only to those who consult with a social worker in his professional capacity.[5] No suggestion is found in this record that the maternal grandparents and the foster parents and all the "others" consulted the social worker. Absent such a finding, question (1) (a) and (1) (b) should be answered, "No."[6]

Last, although we are not asked, I state my agreement with the reporting judge's view that information acquired from the mother and father of the child is not subject to discovery because such information was "acquired from [parents] consulting him in his professional capacity."[7]

ABRAMS, J. (dissenting, with whom Liacos and Lynch, JJ., join). The court does a disservice to the litigants and the trial

---

[5] The court seeks to derive solace from the 1985 amendment to § 135 by its statement, *ante* at 376-377 & n.4, that the Legislature added the bar to disclosure of information acquired by a social worker from a person "whom he has served in his professional capacity." St. 1985, c. 524. I would have thought the clear import of such words to be that there is no "privilege" unless there is a professional relationship between the social worker and the informant. Obviously, there is none between the social worker and the police officers, teachers, neighbors, and others, nor does the record show any such relationship between the social worker and either the grandparents or foster parents.

[6] Nor does it appear that the police officers, teachers, and others "consulted" the social worker. I believe this explains the judge's view that their information was not "privileged."

[7] Having stated my views on the meaning of G. L. c. 112, § 135, I join also in the dissent of Justice Abrams, who states an alternative analysis based on common sense as well as proper analysis of the statutory scheme.

judge by not considering whether exceptions (*b*) and (*f*) of G. L. c. 112, § 135, apply so as to make the Department of Social Services' reports and investigation available to the defendants. It is accurate to state that the trial judge did not ask that question. It is clear, however, that the court thinks the trial judge's reading of G. L. c. 112, § 135, is too narrow. See *ante* at 376-377. Why then does the court also not think that the judge's "conclusion" that exception (*b*) does not apply might be too narrow a reading of the exception?[1] By failing to consider whether exceptions (*b*) and (*f*) apply, the court invites the possibility of a reversal on appeal. I therefore dissent from the court's failure to address the applicability of G. L. c. 112, § 135 (*b*) and (*f*).

General Laws c. 112, § 135, is a small portion of a comprehensive legislative scheme concerned with the care of children in this Commonwealth. The court fails to consider the entire legislative scheme in answering questions 1 (a) and 1 (b). To ascertain the meaning of the words "harmful act," "we must examine the entire statutory scheme governing investigatory reports in matters concerning children, mindful that 'statutes in the same field are to be construed together, if possible, so as to form an harmonious whole.'" *Duro* v. *Duro,* 392 Mass. 574, 579 (1984), quoting *Mercy Hosp.* v. *Rate Setting Comm'n,* 381 Mass. 34, 40 (1980). See also *Casey* v. *Massachusetts Elec. Co.,* 392 Mass. 876, 881 (1984); *Negron* v. *Gordon,* 373 Mass. 199, 201-202 (1977).

In an effort to demonstrate that the defendants bear no, or only partial, responsibility for the death of the plaintiff's son,

---

[1] The court does not discuss any of the exceptions "because the reported questions make no mention of the exceptions, and because the judge's memorandum explaining his reasons for reporting the questions says that the statutory exceptions are 'immaterial' to the case." *Ante* at 378 n.5. Neither reason is persuasive. The reported question refers generally to G. L. c. 112, § 135; that reference to the entire section necessarily includes a reference to the lettered paragraphs therein. The judge's passing reference to the exceptions being "immaterial" comes in his description of the statute. It does not appear in the reported question and does not represent a specific finding made by the judge after individualized consideration of each exception against the facts of the case. In these circumstances, the court is not bound to omit a consideration of the exceptions.

the defendants here seek access to records compiled by the department's social workers that may indicate conduct harmful toward the child by the plaintiff. Paragraph (b) of § 135 provides that a social worker may not "treat as confidential a communication that reveals the contemplation or commission of a crime or a harmful act." In his report, the judge did not indicate whether the relevant department records relate to "harmful acts." [2] He did find, however, the information "would probably be of great assistance [to the defendants] in warding off the claims which the plaintiff has brought against them" and that it "might bear upon the cause of the decedent's illness and death." From this statement, I cannot imagine how such information would not relate to "harmful acts" toward the victim. If the judge read *Commonwealth* v. *Collett,* 387 Mass. 424 (1982), as equating "crime" with "harmful act," that reading is too narrow, both on the facts of *Collett* and on principles of statutory construction. See *Casa Loma, Inc.* v. *Alcoholic Beverages Control Comm'n,* 377 Mass. 231, 234 (1979) (no provision of legislative enactment should be treated as superfluous). Alternatively, the judge may have read the phrase "commission of a . . . harmful act" as referring only to acts of violence visited upon the child, rather than a "mere" lack of care amounting to "neglect." That reading also unduly restricts the meaning of the term "harmful acts."

The determination whether an act is harmful at least should be made by reference to G. L. c. 119, §§ 24, 51A and 51B (1984 ed. & Supp. 1985). See G. L. c. 112, § 135 (f). The court does not discuss the applicability of these statutes. Paragraph (f), inserted by St. 1985, c. 524, added a new exception "where the social worker had acquired the information while conducting an investigation pursuant to section fifty-one B of

---

[2] Because G. L. c. 112, § 135 (f), unambiguously requires disclosure of reports made under G. L. c. 119, § 51B, I assume that if any such reports exist in this case, the judge would have ordered their release without certifying any question to this court But that point is not clear and the court's decision is silent on this point. There is no question that exception (f) applies retroactively. See *City Council of Waltham* v. *Vinciullo,* 364 Mass. 624, 628 (1974) (statutory amendments to the rules of evidence operate retroactively).

chapter one hundred and nineteen." Chapter 119, § 51B (1), requires the Department of Social Services to "investigate and evaluate" information reported to it under G. L. c. 119, § 51A. Section 51A requires various professionals,[3] who "have reasonable cause to believe that a child under the age of eighteen years is suffering serious physical or emotional injury resulting from abuse inflicted upon him including sexual abuse, *or from neglect,* including malnutrition . . . [to] immediately report such condition to the department" (emphasis supplied). Clearly, the Legislature considers "neglect" — the failure to provide proper care and nutrition to a child — as a form of "abuse" that can be "inflicted" on a child. As such, neglect is the "commission of a . . . harmful act" for purposes of exception (*b*). To hold otherwise is to fragment the statutes pertaining to the proper care of children.

Similarly, G. L. c. 112, § 135 (*d*), exempts from the social worker privilege information developed for purposes of initiating a petition for care and protection under G. L. c. 119, § 24. Such a petition may be filed when a person alleges that a child is "without: (*a*) necessary and proper physical or educational care and discipline or; (*b*) is growing up under conditions or circumstances damaging to the child's sound character development or; (*c*) who lacks proper attention of parent, guardian with care and custody, or custodian or; (*d*) whose parents, guardian or custodian are unwilling, incompetent or unavailable to provide any such care, discipline or attention." Under the terms of G. L. c. 119, § 24, such allegations, if shown, amount to "serious abuse or neglect."

In enacting c. 112, "[t]he Legislature has determined that while the preservation of the confidential relationship [between social workers and clients] is an important objective, under

---

[3] The statute mandates reporting by any "physician, medical intern, hospital personnel engaged in the examination, care or treatment of persons, medical examiner, psychologist, emergency medical technician, dentist, nurse, chiropractor, podiatrist, osteopath, public or private school teacher, educational administrator, guidance or family counselor, day care worker, probation officer, clerk/magistrate of the district courts, social worker, foster parent, firefighter or policeman."

certain circumstances, this goal must give way in favor of other societal interests." *Collett, supra* at 428. It is anomalous to assume, as the court does, that, with respect to information connecting a child's death to the quality of care he received from his parents, the Legislature struck the balance in favor of disclosure in exceptions (*d*) and (*f*), but struck the balance in favor of confidentiality in exception (*b*), if the impetus for the social worker's investigation and report was something other than a complaint made under G. L. c. 119, § 51A, or a report of an investigation under G. L. c. 119, § 51B, or a petition for care and protection under G. L. c. 119, § 24.

Because G. L. c. 112, § 135 (*b*), exempts from the social worker privilege any communications which relate directly to the fact or immediate circumstances of conduct harmful toward a child, whether by commission of overt acts or omission of required parental duties, I conclude that the defendants are entitled to the reports.